JACK WINSTON LONDEN AND DORIS M. LONDEN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2142-62, 3089-63. Filed October 22, 1965.

*Gene F. Reardon*, for the petitioners.
*Arthur B. Bleecher*, for the respondent.

TANNENWALD, *Judge:*[1] Respondent determined deficiencies of $1,769.20 and $1,434.70 in petitioners' income tax for 1958 and 1959, respectively. Initially there were two issues in this case: (1) The deductibility of certain charitable contributions and (2) the correct salvage value of an automobile for purposes of determining deprecia-

---

[1] These cases were heard by Judge Morton P. Fisher and briefs were duly filed. Judge Fisher died on Feb. 11, 1965. These cases, not having been disposed of, were reassigned to Judge Theodore Tannenwald, Jr., on Aug. 4, 1965, and notice was given to the parties that any request for rehearing or reargument might be presented to him within 30 days. No such requests have been received.

tion thereon. The respondent has acceded to petitioners' position on the second issue. As to the first issue, the parties are agreed on the amount of the contributions and the fact that the donees are organizations referred to in section 170 of the 1954 Code. They disagree only as to the years in which the contributions are deductible.

FINDINGS OF FACT

Petitioners were residents of Boulder, Colo., during 1958 and 1959 and their joint Federal income tax returns for those years were prepared on the cash basis. Such returns were filed with the district director of internal revenue, Denver, Colo. Any reference herein to the petitioner or Londen shall be in reference to Jack Winston Londen, his wife, Doris M. Londen, being a party to this proceeding only by reason of having filed joint returns with him.

During the years in question Londen was president and Charles C. Shoemaker was secretary of Green Shield Plan, Inc., a Colorado corporation (hereinafter referred to as Shield). Londen owned approximately 30 percent of Shield's outstanding common stock during 1958 and 1959 and was president of the corporation in those years. Through his individual stock interest and proxies obtained from other shareholders, he exercised substantial control of Shield.

On March 20, 1958, petitioner endorsed in blank a certificate representing 40,000 shares of Shield and delivered it to Shoemaker. Sometime in December 1958, Londen orally informed Shoemaker that he wished to donate 2,500 of the shares represented by that certificate to the Jack Winston Londen Foundation (hereinafter referred to as Foundation). Londen was president of Foundation and Shoemaker held its books and records in 1958 and 1959.

Londen did nothing further with respect to the gift to Foundation and the 2,500 shares were transferred on Shield's records on January 14, 1959. Shield was its own transfer agent on that date. Petitioners treated the donation to Foundation as a charitable contribution in 1958 on their Federal income tax return for that year.

Prior to December 11, 1959, petitioner contacted the Reverend Robert J. Hempfling, minister of the First Christian Church in Boulder (hereinafter referred to as Church) and told Hempfling that he planned to donate 1,675 Shield shares to Church. Londen wished to complete the gift during 1959 in order to claim the donation as a charitable contribution on his 1959 Federal income tax return. The minister, when told by petitioner that Church's gift would come from a Shield certificate representing 10,000 shares, suggested that Londen deliver to Shoemaker the certificate and instruct Shoemaker to deliver the certificate for 1,675 shares to Church.

Petitioner also desired to donate to Foundation 2,550 Shield shares from the same certificate. On December 11, 1959, he wrote to Neil Vriese, his accountant, informing him "that as of this date I have entered into an obligation whereby I must contribute" the shares to Church and Foundation.

On December 30, 1959, petitioner endorsed the certificate for 10,000 shares in blank and delivered it to Shoemaker with oral instructions to have 2,550 shares transferred to Foundation and 1,675 shares to Church. On that same date Shoemaker, in his capacity as secretary of Shield and on the letterhead of Shield, wrote from Boulder to U.S. Stock Transfer Corp. in Denver, Shield's stock transfer agent on that date, enclosing the certificate and instructing it to transfer the shares to Foundation and Church, to issue the balance to Londen, and to return "all three certificates to me." He added a handwritten note, "Please rush these—Thanks—."

The shares were transferred on Shield's records on January 13, 1960. On January 20, 1960, Hempfling signed a statement addressed "To whom it may concern," certifying that Londen contributed 1,675 shares of Shield to Church in 1959.

Petitioners treated the donations to Foundation and Church as charitable contributions in 1959 on their Federal income tax return for that year.

In his notices of deficiency, respondent determined that the contribution of 2,500 shares of Shield to Foundation did not occur in 1958 and the contributions of 1,675 shares to Church and 2,550 shares to Foundation did not occur in 1959.

OPINION

Determination of the years in which the charitable contributions involved herein are deductible turns on the points in time at which petitioner placed the shares beyond his control.[2] Involved in this determination is "certain ritualistic or ceremonial conduct" by the

---

[2] I.R.C. 1954:

SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate.

Income Tax Regs.:

1.170–1 Charitable, etc., contributions and gifts; allowance of deduction.

(b) *Time of making contribution.* Ordinarily a contribution is made at the time delivery is effected. * * * If a taxpayer unconditionally delivers (or mails) a properly endorsed stock certificate to a charitable donee or the donee's agent, the gift is completed on the date of delivery (or mailing, provided that such certificate is received in the ordinary course of the mails). If the donor delivers the certificate to his bank or broker as the donor's agent, or to the issuing corporation or its agent, for transfer into the name of the donee, the gift is completed on the date the stock is transferred on the books of the corporation.

donor. See *Richardson* v. *Commissioner*, 126 F. 2d 562, 567 (C.A. 2, 1942), modifying 39 B.T.A. 927 (1939). The basic question involved herein is whether Londen so conducted himself as to satisfy the ritual required by the statute and the regulations issued thereunder.

Petitioner seeks to sustain his position that his delivery of the certificates to Shoemaker ended his control over the donated shares on the ground that Shoemaker was the agent of Foundation and Church. Respondent counters by asserting that Shoemaker was not such an agent and that at all times prior to the actual transfer of the shares on Shield's records in 1959 and 1960 Londen had the power effectively to recall the gifts.

We conclude that respondent must prevail.

The assertion that Shoemaker acted as the agent of Foundation rests exclusively on the oral testimony of Londen and Shoemaker. Londen's assertion must be weighed in the light of his obvious interest in a finding that Shoemaker was Foundation's agent. No evidence was presented that Shoemaker had acted as Foundation's agent in any other instance. Significantly, Shoemaker's letter to U.S. Stock Transfer Corp. was written on Shield stationery, signed by him as secretary of Shield, and contained no indication that he was acting as Foundation's agent.

Moreover, Shoemaker was an employee of Shield, a corporation of which Londen was president, in which he owned a large percentage of stock, and over which he exercised substantial control. Shoemaker's duties for Foundation were purely ministerial. He undoubtedly performed them for Londen's convenience as a consequence of his relationship to Shield and Londen. There is no credible evidence that such duties conferred upon him authority to act as the agent of Foundation with respect to donations.

Under these circumstances, it seems unlikely that Shoemaker would have refused to honor a countermand of the transfer instructions issued by petitioner in 1958 prior to the execution thereof. The testimony of Londen that the minister of Church stated in 1959 that Shoemaker should hold the certificates for Church was pure hearsay and is completely negated by Shoemaker's own testimony that he had no connection with Church. Equally lacking in probative effect is the minister's 1960 letter stating that Londen had made a gift of the shares to Church in 1959.

As regards the instructions issued in 1959, we recognize that the U.S. Stock Transfer Corp. occupied a different relationship to Londen and Shield from that of Shoemaker. But there is no evidence that it would have refused to obey any countermand of its instructions either from Londen or from Shoemaker on Londen's behalf prior to the actual transfer of the shares in 1960, or at the very least prior to the

actual receipt of the shares.[3]  Cf. Colo. Rev. Stat. Ann., secs. 31–11–6, 31–11–7, 31–11–9 (1963).

Londen's letter to his accountant adds nothing.  Even if Londen's "obligation" were a legal instead of a moral one, the existence of an obligation is not synonymous with its implementation.

Although the certificates passed out of Londen's physical possession in the years in which the deductions were claimed, they were merely endorsed in blank and there is no evidence that the recipients of the certificates (in one year Shoemaker and in the other U.S. Stock Transfer Corp.) were under any instructions to deliver the certificates directly to the named donees.  Indeed, in respect of the gifts alleged to have been made in 1959, Shoemaker's instructions to U.S. Stock Transfer Corp. were to return the certificates to him.

Petitioner relies heavily on *Dulin* v. *Commissioner*, 70 F. 2d 828 (C.A. 6, 1934), reversing on this issue 25 B.T.A. 1259 (1932).  It is sufficient to note that that case did not involve a provision of law requiring verification under respondent's regulations, such as is now contained in section 170(a)(1) of the Code, nor a provision of respondent's regulations such as is now contained in the last sentence of section 1.170–1(b),[4] Income Tax Regs., requiring transfer on the books of the issuing corporation.[5]  Regulations promulgated under such circumstances carry a strong presumption of validity.  *Ruud Manufacturing Co.*, 10 T.C. 14 (1948), affirmed per curiam 173 F. 2d 222 (C.A. 3, 1949) ; *Jules Samann*, 36 T.C. 1011, 1018 (1961), affd. 313 F. 2d 461 (C.A. 4, 1963).  Moreover, in *Dulin* the transfer agent was instructed to deliver the shares directly to the donee.  We therefore believe that *Dulin* is not controlling.  Similarly, *Delight Ward Merner*, 32 B.T.A. 658 (1935), and *William W. Mein*, a Memorandum Opinion of this Court, dated Aug. 14, 1946, are also distinguishable.

We believe that, while the relationships involved herein perhaps do not achieve the status of the "bedchamber" relationship that may exist between husband and wife (see *Richardson* v. *Commissioner*, *supra* at 567), there are sufficient similarities to cause us to conclude that petitioner's conduct was not sufficiently "ritualistic or ceremonial" to achieve that level of relinquishment of dominion and control which would entitle him to the deductions in the taxable years claimed.  Cf. *Burroughs Corporation*, 33 T.C. 389 (1959) ; *Lewis C. Christensen*, 40 T.C. 563 (1963).

---

[3] The letter from Shoemaker to U.S. Stock Transfer Corp. was dated Dec. 30, 1959, but there is no evidence as to when it was mailed or when it was received.

[4] This sentence first appeared in the regulations in 1958.  See 1958–2 C.B. 627 *et seq.* See also Gift Tax Regs., sec. 25.2511–2(h).

[5] We do not decide whether the respondent's regulations would necessarily control if the certificates were delivered, duly endorsed, to an *independent* transfer agent with instructions to deliver the donated shares directly to the donees.  Cf. *Tracy* v. *Commissioner*, 70 F. 2d 93 (C.A. 6, 1934), reversing 25 B.T.A. 1055 (1932); *Estate of Modie J. Spiegel*, 12 T.C. 524 (1949) ; Uniform Stock Transfer Act, secs. 1, 6, 7, 9, 22(1).

Petitioner is, of course, entitled to treat as a charitable contribution in 1959 the 2,500 shares transferred to Foundation in that year. For this reason, and in order to reflect the agreement of the parties on the depreciation issue,

*Decisions will be entered under Rule 50.*