108 T.C. No. 14


UNITED STATES TAX COURT


MICHAEL FERGUSON AND VALENE FERGUSON, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ROGER N. FERGUSON AND SYBIL FERGUSON, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 21808-93, 18250-94.    Filed April 28, 1997.


    Held:  Ps donated to various charitable
organizations (the Charities) appreciated stock in C1.
Prior to the gifts, C1 and C2 entered into a merger
agreement, C2 made a tender offer for the shares of C1,
and shares of C1 sufficient to approve the merger were
tendered or guaranteed.  The Charities subsequently
sold the stock of C1 received from Ps pursuant to the
tender offer.  Ps are taxable on the gain in the stock
transferred to the Charities under the anticipatory
assignment of income doctrine.


David R. Bosse, for petitioners.

Robert First (specially recognized) for petitioners.

- 2 -

Stephen M. Miller, for respondent.

HALPERN, Judge:  These consolidated cases involve the following determinations by respondent of deficiencies in, additions to, and penalties on petitioners' Federal income tax:

Docket No. 21808-93     Michael Ferguson and Valene Ferguson

| | | Additions to Tax and Penalties | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653 | Sec. 6654 | Sec. 6661 | Sec. 6662 |
| 1987 | $29,115 | -- | -- | -- | $5,823 |
| 1988 | 1,249,580 | $36,491 | $94,384 | $182,456 | 103,951 |
| 1989 | 117,227 | -- | -- | -- | 23,445 |
| 1990 | 75,197 | -- | -- | -- | 15,039 |
| 1991 | 66,942 | -- | -- | -- | 13,388 |

Docket No. 18250-94     Roger N. Ferguson and Sybil Ferguson

| | | Additions to Tax and Penalties | | | | |
|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6659 | Sec. 6661 | Sec. 6662(a) | Sec. 6621(c) |
| 1988 | $2,017,297 | $170,767 | $427,524 | $163,701 | -- | [1] |
| 1989 | 160,451 | -- | -- | -- | $50,353 | -- |
| 1991 | 624,490 | -- | -- | -- | 127,120 | -- |

[1]120% of interest due on $1,425,079

Certain adjustments having been agreed to and concessions made, the sole issue remaining for decision is whether petitioners are taxable on the gain in appreciated stock transferred to various charitable organizations under the anticipatory assignment of income doctrine.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of fact and the supplemental stipulation of fact filed by the parties, both with attached exhibits, are incorporated herein by this reference. Petitioners Michael and Valene Ferguson and Roger and Sybil Ferguson resided in Rexburg, Idaho, at the time their petitions herein were filed.

Background

On January 17, 1972, Four Star, Inc. (Four Star), was incorporated under the laws of the State of Idaho. All of the stock of Four Star was owned by Roger and Sybil Ferguson and two other shareholders. On March 10, 1972, Roger and Sybil Ferguson purchased all of the stock of Four Star owned by the two other shareholders. In March 1975, the corporate name of Four Star was changed to Diet Center, Inc. (Diet Center). From 1975 to March 31, 1985, Roger Ferguson, Sybil Ferguson, and their son, Michael Ferguson, were president, secretary/treasurer, and executive vice-president of Diet Center, respectively, and those individuals constituted the board of directors of Diet Center.

American Health Companies, Inc. (AHC), was incorporated under the laws of the State of Delaware on March 8, 1983. On or about April 1, 1985, AHC acquired, through a series of corporate transactions, Diet Center, which, theretofore, had been wholly

owned by petitioners Roger and Sybil Ferguson and their five children, including petitioner Michael Ferguson.

In June 1986, pursuant to a public offering, AHC and certain of its shareholders sold 3,000,000 shares of AHC stock.

AHC, through franchises operating under the name of Diet Center, provided weight loss and diet counseling services and marketed a variety of vitamins, minerals, and food products.

As of July 28, 1988, there were 6,952,863 issued and outstanding shares of AHC stock, and members of the Ferguson family owned approximately 1,309,500 (18.8 percent) of those shares. Roger and Sybil Ferguson owned approximately 656,000 shares (9.4 percent), and Michael Ferguson owned approximately 520,000 shares (7.5 percent). From April 1, 1985, through at least September 15, 1988, Roger Ferguson served as consultant for AHC, Sybil Ferguson was employed as president of Diet Center, and Michael Ferguson was employed as president of AHC. From January 1, 1988, through July 28, 1988, the board of directors of AHC consisted of, among other individuals, Roger Ferguson (Chairman), Sybil Ferguson (Vice Chairperson), Michael Ferguson, and C. Stephen Clegg.

## Merger Agreement and Tender Offer

In December 1987, after informal discussions among the members of the board of directors of AHC, C. Stephen Clegg contacted Goldman, Sachs & Co. (Goldman, Sachs) in connection with a possible sale of AHC. A letter agreement was executed on

March 4, 1988, authorizing Goldman, Sachs, among other things, to search for a purchaser of AHC and to assist in the sale negotiations. By July 22, 1988, Goldman, Sachs received four proposals.

On July 28, 1988, AHC, CDI Holding, Inc. (CDI), which was a corporation owned by Thomas H. Lee Co. and ML-Lee Acquisition Fund, L.P., and DC Acquisition Corp. (DC Acquisition), which was a wholly owned subsidiary of CDI, entered into an agreement and plan of merger (the merger agreement). The merger agreement provided that, as soon as practicable after DC Acquisition had purchased the stock of AHC by means of a tender offer of $22.50 a share, DC Acquisition would be merged into AHC, and AHC would thereupon become a wholly owned subsidiary of CDI. According to the merger agreement, each outstanding share of AHC stock would be converted into the right to receive $22.50 in cash.

It was expected that, upon consummation of the merger, Roger and Sybil Ferguson would become members of the executive committee of AHC and the board of directors of CDI, and Sybil Ferguson would become president of AHC. In addition, Roger and Sybil Ferguson and their children, including Michael Ferguson, were offered the opportunity to make an equity investment in CDI by means of an exchange of AHC stock or options for securities of CDI.

The board of directors of AHC, with Roger Ferguson, Sybil Ferguson, and Michael Ferguson abstaining, unanimously authorized

and approved of the merger agreement, determined that $22.50 a share was a fair price, and recommended acceptance of the offer to the shareholders of AHC. The obligation of AHC to effect the merger was subject to various conditions, including approval of the merger agreement by shareholders owning a majority of AHC stock. The authority of AHC shareholders to withhold approval of the merger was limited by the right of DC Acquisition and CDI to proceed with the merger upon acquisition of a majority of the outstanding shares. The terms of the tender offer provided:

> Pursuant to the Certificate of Incorporation, as amended, of the Company [AHC] and the Delaware Law, if the Purchaser [DC Acquisition] acquires pursuant to the Offer a majority of the outstanding Shares, then the Purchaser will be able to assure that the requisite number of affirmative votes in favor of the Merger will be received even if no other stockholder votes in favor of the Merger. Pursuant to the short form merger provisions of the Delaware law, if the Purchaser holds 90% or more of the outstanding Shares, the Merger can be effected, and the Purchaser intends to effect the Merger, without a meeting or vote of the stockholders of the Company.

The obligation of DC Acquisition and CDI to effect the merger was also subject to various conditions. On August 3, 1988, pursuant to a tender offer, DC Acquisition offered to purchase all of the issued and outstanding AHC stock for $22.50 a share. The tender offer was conditioned on DC Acquisition's acquiring and owning at least 85 percent of the AHC stock upon consummation of the tender offer (minimum tender condition). The minimum tender condition could be waived by DC Acquisition in its sole discretion. DC Acquisition and CDI also had the right to

terminate or amend the tender offer upon the occurrence of material adverse changes affecting AHC. The original expiration date for the tender offer was August 30, 1988, but the expiration date was extended to September 9, 1988, as a result of a fire that totally destroyed the AHC product manufacturing plant on August 25, 1988.

On August 3, 1988, a letter, signed by Roger and Sybil Ferguson as co-chairpersons of AHC, was sent to all shareholders of record. That letter stated, among other things:

> Your Board of Directors has determined that each of the DC Acquisition offer and merger is fair to the shareholders of American Health and recommends that all shareholders accept the offer and tender their shares to DC Acquisition.

The supplement to the offer to purchase, dated August 22, 1988, filed with the Securities and Exchange Commission (SEC) as an exhibit to schedule 14D-9, and signed by Michael Ferguson, states:

> The Fergusons have advised the Parent [CDI], subject to applicable securities laws, that they will purchase the stock in Parent by means of an exchange of Shares they hold in the Company [AHC], valued at $22.50 per share, for an amount of stock in Parent of equivalent value. Subject to applicable securities laws, Sybil and Roger Ferguson and Michael D. Ferguson have advised the Parent and the Company that they will tender all of their Shares not exchanged for stock in the Parent.

> Sybil Ferguson is expected to become President of the Company following the consummation of the Offer. It is anticipated that she will enter into a three year employment agreement with the Company pursuant to which she will receive an annual salary of $200,000. Pursuant to the agreement, she will be a full time employee and will be eligible to participate in an

executive incentive plan and a long term incentive plan which are expected to be developed by the Board of Directors for participation by key members of senior management.  The agreement with Sybil Ferguson is expected to contain appropriate non-competition covenants.

Roger Ferguson's present consulting agreement with the Company is expected to be extended on its present terms so that it will expire at the same time as the employment agreement with Mrs. Ferguson.  Mr. Ferguson is also expected to agree to non-competition covenants similar to those of Mrs. Ferguson.

Although the parties have reached general understandings with respect to the foregoing matters, no written agreements have been entered into.  * * *

The continued involvement of Sybil Ferguson in the activities of AHC was an important aspect of the acquisition of AHC by CDI and DC Acquisition.

The supplement to the offer to purchase also stated that the $22.50 a share offer price represented a multiple of approximately 16 times AHC's earnings a share for the year ended March 31, 1988, a 24.1 percent premium over the market price for the shares as of July 22, 1988 (the last trading day prior to the announcement by AHC that it had received bids from prospective acquirors), and a premium of approximately 1,084 percent over the tangible book value of AHC shares as of June 30, 1988.  In addition, the supplement stated that, as of March 31, 1988, the total book value a share of outstanding common stock exclusive of treasury shares was $6.59, and such book value a share, exclusive of goodwill, was $1.94.

The terms of the tender offer provided that "No stockholder of the Company [AHC] has executed any agreement obligating him to tender Shares to the Purchaser [DC Acquisition] in response to the Offer."  The terms of the tender offer provided that shares tendered pursuant to the tender offer could be withdrawn, upon valid notice, at any time prior to the expiration date of the tender offer.

Pursuant to the tender offer, the stock of AHC was tendered by AHC shareholders in the following manner:

| Close of Business Date | Shares Tendered | Shares Guaranteed | Percentage of Outstanding Shares Tendered or Guaranteed |
|---|---|---|---|
| 8/15/88 | 33,924 | -- | 0.5 |
| 8/16/88 | 104,024 | -- | 1.5 |
| 8/17/88 | 318,678 | -- | 4.6 |
| 8/18/88 | 707,306 | -- | 10.2 |
| 8/19/88 | 723,886 | -- | 10.4 |
| 8/22/88 | 952,554 | -- | 13.7 |
| 8/24/88 | 1,594,736 | -- | 22.9 |
| 8/25/88 | 1,824,674 | -- | 26.2 |
| 8/26/88 | 2,189,329 | -- | 31.5 |
| 8/29/88 | 2,731,041 | -- | 39.3 |
| 8/30/88 | 2,894,132 | -- | 41.6 |
| 8/31/88 | 3,596,997 | 31,032 | 52.2 |
| 9/1/88 | 3,627,605 | 31,172 | 52.6 |
| 9/2/88 | 3,638,046 | 31,772 | 52.8 |
| 9/6/88 | 3,704,602 | 2,019 | 53.3 |
| 9/7/88 | 3,707,157 | 1,279 | 53.3 |
| 9/8/88 | 3,976,886 | 1,279 | 57.2 |
| 9/9/88 | 5,482,162 | 1,136,167 | 95.2 |
| 9/12/88 | 5,650,081 | 968,248 | 95.2 |
| 9/13/88 | 6,327,303 | 291,026 | 95.2 |
| 9/14/88 | 6,381,140 | 237,189 | 95.2 |
| 9/16/88 | 6,504,488 | 113,841 | 95.2 |
| 9/19/88 | 6,529,273 | 89,056 | 95.2 |
| 9/20/88 | 6,613,500 | 4,829 | 95.2 |

Gifts by Michael Ferguson

On August 15, 1988, Michael Ferguson, in contemplation of a tithing, executed a donation-in-kind record indicating his intention to donate 30,000 shares of AHC stock to the Church of Jesus Christ of the Latter Day Saints (the Church). On or about August 16, 1988, Brett Floyd, a Merrill Lynch stockbroker, assisted Michael Ferguson to open a new brokerage account and to place 391,651 shares of AHC stock in that account. A legend restricting transfer appeared on those shares, and Merrill Lynch would not sell or otherwise transfer the shares until it was advised that it could do so by its legal department; that clearance process "took upwards of two weeks". On or about August 26, 1988, Michael Ferguson formed the Michael Ferguson Charitable Foundation (MF Foundation). On September 8, 1988, Brett Floyd caused an in-house journal entry to be made to transfer from Michael Ferguson's brokerage account 30,000 shares of AHC stock to an account maintained by the Church and 27,000 shares of AHC stock to the account maintained by the MF Foundation. On September 9, 1988, Michael Ferguson executed an authorization to transfer the shares that Brett Floyd transferred by in-house journal entry the day before. A donation-in-kind receipt issued to Michael Ferguson by the Church provides that the date of donation for the 30,000 shares of AHC stock was September 9, 1988. On October 5, 1988, Billy G. DuPree, Jr., an officer of AHC, forwarded to the SEC a statement of changes in

beneficial ownership of securities (SEC Form 4) with respect to Michael Ferguson. That statement indicates that the gifts to the Church and the MF Foundation occurred on September 9, 1988.

Gifts by Roger and Sybil Ferguson

On August 21, 1988, Roger Ferguson, in contemplation of a tithing, executed a donation-in-kind record indicating the intention of Roger and Sybil Ferguson to donate 31,111 shares of AHC stock to the Church. On or about August 23, 1988, Brett Floyd assisted Roger and Sybil Ferguson to open a new brokerage account and to place 341,366 shares of AHC stock in that account. A legend restricting transfer appeared on those shares, and Merrill Lynch would not sell or otherwise transfer the shares until it was advised that it could do so by its legal department; that clearance process "took upwards of two weeks". On August 26, 1988, Roger and Sybil Ferguson formed the Roger and Sybil Ferguson Charitable Foundation (R & S Foundation). On September 8, 1988, Brett Floyd caused an in-house journal entry to be made to transfer from Roger and Sybil Ferguson's brokerage account 31,111 shares of AHC stock to an account maintained by the Church and 26,667 shares of AHC stock to the account maintained by the R & S Foundation. On September 9, 1988, Roger and Sybil Ferguson executed an authorization to transfer the shares that Brett Floyd transferred by in-house journal entry the day before. On October 5, 1988, Billy G. DuPree, Jr., forwarded to the SEC statements of changes in beneficial ownership of

securities (SEC Form 4) with respect to Roger and Sybil Ferguson. Those statements indicate that the gifts to the Church and the R & S Foundation occurred on September 9, 1988.

Consummation of the Transaction

On September 9, 1988, Roger and Sybil Ferguson exchanged 133,334 shares of AHC stock for 100,000 shares of CDI common stock and 20,000 shares of CDI preferred stock, and they tendered their remaining shares in accordance with the tender offer.[1] On September 9, 1988, Michael Ferguson exchanged 33,333 shares of AHC stock for 25,000 shares of CDI common stock and 5,000 shares of CDI preferred stock, and he tendered his remaining shares in accordance with the tender offer. Other members of the Ferguson family engaged in similar transactions. The various charities that received shares of AHC stock from petitioners tendered those shares on September 9, 1988.

On September 12, 1988, DC Acquisition announced its acceptance of all the tendered or guaranteed shares of AHC stock. On September 13, 1988, DC Acquisition purchased the 6,618,329 tendered or guaranteed shares of AHC stock in exchange for $22.50 a share and became a shareholder of AHC.

As a result of DC Acquisition's acquiring in excess of 90 percent of the stock of AHC, the merger was effected on or

---

[1]   It should be noted that some of the AHC stock owned by petitioners Roger and Sybil Ferguson and Michael Ferguson was transferred to an entity named Silver Hawk, Inc. Those transfers are not in issue in the present case.

about October 14, 1988, pursuant to a consent of the sole director of DC Acquisition to a resolution stating the terms of the merger, dated October 12, 1988. AHC thereupon became a subsidiary of CDI. Sybil Ferguson became president of AHC, and Roger Ferguson became a consultant for AHC. In addition, Roger and Sybil Ferguson became members of AHC's executive committee and CDI's board of directors.

OPINION

I. Introduction

A. Issue

Petitioners donated appreciated stock in American Health Companies, Inc. (AHC), to the Church of Jesus Christ of the Latter Day Saints (the Church), the Michael Ferguson Charitable Foundation, and the Roger and Sybil Charitable Foundation (collectively, the Charities). The Charities subsequently sold that stock to DC Acquisition Corp. (DC Acquisition) pursuant to a tender offer. The sole issue for decision is whether petitioners are taxable on the gain in the stock transferred to the Charities under the anticipatory assignment of income doctrine. Petitioners bear the burden of proof. Rule 142(a).

B. Arguments of the Parties

Petitioners contend that they are not taxable on the gain in the stock transferred to the Charities. First, relying on our decision in Palmer v. Commissioner, 62 T.C. 684 (1974), affd. on

other grounds 523 F.2d 1308 (8th Cir. 1975), petitioners assert that the Charities were not legally obligated, nor could they be compelled, to tender their AHC stock in accordance with the tender offer, and, therefore, the proceeds received by the Charities in exchange for AHC stock that was voluntarily tendered cannot be attributed to petitioners.  Second, relying primarily on Hudspeth v. United States, 471 F.2d 275 (8th Cir. 1972), and Estate of Applestein v. Commissioner, 80 T.C. 331 (1983), petitioners assert that the date on which the right to the tender offer proceeds matured was October 12, 1988, when the board of directors of DC Acquisition adopted a resolution stating the terms of the merger, and that the gifts occurred prior to that date.  Petitioners argue, alternatively, that the earliest date on which the right to the tender offer proceeds matured was September 12, 1988, when DC Acquisition formally announced that it had accepted all of the tendered or guaranteed shares of AHC stock, and that the gifts occurred prior to that date.

Respondent, relying primarily on our decisions in Estate of Applestein and Peterson Trust v. Commissioner, T.C. Memo. 1986-267, affd. without published opinion 822 F.2d 1093 (8th Cir. 1987), contends that the July 28, 1988, merger agreement (the merger agreement) coupled with the August 3, 1988, tender offer at a price of $22.50 a share (the tender offer) was, in reality and substance, the functional equivalent to a shareholder vote

approving the merger agreement and that the gifts occurred subsequent thereto.

Resolution of the competing positions advanced by the parties requires an analysis of the circumstances surrounding the merger agreement, the tender offer, and the gifts to the Charities.  Based on the facts of this case, we believe that the stock of AHC was converted from an interest in a viable corporation to the right to receive cash prior to the date of the gifts to the Charities, and, therefore, petitioners are taxable on the gain in the donated stock.

II.  <u>Analysis</u>

A.  <u>Date of the Gifts</u>

Section 170(a) allows a deduction for any charitable contribution payment of which is made within the taxable year. The term "charitable contribution" is defined in section 170(c) as a contribution or gift to or for the use of various enumerated entities and, therefore, is synonymous with the term "gift".  See <u>DeJong v. Commissioner</u>, 36 T.C. 896, 899 (1961), affd. 309 F.2d 373 (9th Cir. 1962).  Thus, the donation of AHC stock to the Charities must satisfy the requirements of a valid inter vivos gift in order to qualify as a charitable contribution under section 170(a).  See, e.g., <u>Guest v. Commissioner</u>, 77 T.C. 9, 15-16 (1981).  The existence of the gifts to the Charities, however,

is not in dispute.  The contested issue is the date of those gifts.

Petitioners, relying on section 1.170A-1(b), Income Tax Regs., assert that the gifts occurred when their AHC stock certificates along with irrevocable instructions regarding their donations to the Charities were delivered to Brett Floyd, who served in the capacity of agent for the Charities.  Thus, petitioners contend that the gifts by Michael Ferguson occurred on August 15, 1988, and that the gifts by Roger and Sybil Ferguson occurred on August 21, 1988.

Section 1.170A-1(b), Income Tax Regs., provides:

Ordinarily, a contribution is made at the time delivery
is effected.  * * *  If a taxpayer unconditionally
delivers or mails a properly endorsed stock certificate
to a charitable donee or the donee's agent, the gift is
completed on the date of delivery or, if such
certificate is received in the ordinary course of the
mails, on the date of mailing.  If the donor delivers
the stock certificate to his bank or broker as the
donor's agent, or to the issuing corporation or its
agent, for transfer into the name of the donee, the
gift is completed on the date the stock is transferred
on the books of the corporation.  * * *

This Court in London v. Commissioner, 45 T.C. 106 (1965), considered the application of section 1.170-1(b), Income Tax Regs., the precursor to the regulation relied on by petitioners. In that case, the taxpayer delivered an executed stock certificate to his agent (though the taxpayer argued that the agent was the agent of the donee) and instructed the agent to transfer the stock to a charity in December 1959; the transfer

became effective in January 1960.  The Court held that the date on which the donor instructed his agent to transfer the stock to the donee was not determinative of when the gift was complete. See id. at 110.  Delivery of the gift of stock was complete upon relinquishment of dominion and control of the stock by the donor, which occurred upon actual transfer on the books of the issuing corporation.  Id.; Morrison v. Commissioner, T.C. Memo. 1987-112. The Court noted that even if the taxpayer's obligation upon delivery to his agent "were a legal instead of a moral one, the existence of an obligation is not synonymous with its implementation."  Londen v. Commissioner, supra at 110.

First, the facts indicate that Brett Floyd acted as petitioners' agent and not the Charities' agent.  Brett Floyd not only facilitated the transfer of AHC stock to the Charities, but also assisted petitioners in the exchange of their AHC stock for shares of CDI and the tender of their remaining shares in accordance with the tender offer.  The fact that Brett Floyd may have assisted the Church on previous occasions does not change the nature of his role with respect to the transactions involving petitioners.  When petitioners Roger and Sybil Ferguson and Michael Ferguson placed, with the assistance of Brett Floyd, 341,366 and 391,651 shares of AHC stock in their respective accounts, Brett Floyd acted as petitioners' agent.  Second, petitioners delivered to Brett Floyd stock that Merrill Lynch would not immediately sell or otherwise transfer.  Merrill

Lynch's process for receiving clearance to sell or transfer the shares "took upwards of two weeks". Indeed, the authorizations to transfer the stock to the Charities are dated September 9, 1988. The donation-in-kind receipt from the Church received by petitioner Michael Ferguson provides that the date of donation for the 30,000 shares of AHC stock was September 9, 1988. The statements of changes in beneficial ownership of securities forwarded to the Securities and Exchange Commission by Billy G. DuPree, Jr., indicate that the gifts occurred on September 9, 1988. Furthermore, petitioners have failed to explain how the gifts to the charitable foundations occurred on August 15, 1988, and August 21, 1988, respectively, when the foundations were formed on or about August 26, 1988. Considering the substantial documentary evidence, petitioners have failed to persuade us that depositing stock in their brokerage accounts with instructions to Brett Floyd to transfer some of the stock to the Charities constituted the unconditional delivery of stock to a charitable donee's agent pursuant to section 1.170A-1(b), Income Tax Regs.

In the alternative, petitioners, relying on Richardson v. Commissioner, T.C. Memo. 1984-595, assert that petitioners' transfer of the AHC stock to Brett Floyd created a voluntary trust that completed the gifts on the date of delivery. In light of our conclusion that Brett Floyd acted as petitioners' agent, we reject petitioners' alternative argument.

Based on the circumstances surrounding the gifts to the Charities, we believe that Brett Floyd acted as petitioners' agent in the transfer of the AHC stock and that petitioners relinquished control of the stock on September 9, 1988, when the letters of authorization were executed, and we so find.  The gifts to the Charities, therefore, were complete on September 9, 1988.

B.  Anticipatory Assignment of Income

    1.  Case Law

It is a well-established principle of the tax law that the person who earns or otherwise creates the right to receive income is taxed.  E.g., Lucas v. Earl, 281 U.S. 111, 114-115 (1930).  When the right to income has matured at the time of a transfer of property, the transferor will be taxed despite the technical transfer of that property.  E.g., Estate of Applestein v. Commissioner, 80 T.C. at 345.  The mere anticipation or expectation of income at the time of transfer, however, is insufficient to create a fixed right to earned income.  Id.  The reality and substance of a transfer of property govern the proper incidence of taxation and not formalities and remote hypothetical possibilities.  E.g., Hudspeth v. United States, 471 F.2d at 277.  It is the province of the trial court to determine the proper characterization of a particular transaction upon consideration of all the facts and circumstances.  See United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 456 (1950) (application

of substance-over-form doctrine); Harrison v. Schaffner, 312 U.S. 579, 583 (1941) (application of assignment of income doctrine).

In Hudspeth v. United States, supra, the taxpayer, who was an 81.5-percent shareholder, a director, president, and treasurer of a corporation, donated to various charitable organizations stock in the corporation, which had previously adopted a plan of liquidation pursuant to resolution by its board of directors and ratification by the shareholders. The Court of Appeals for the Eighth Circuit rejected the taxpayer's contention "that the date of the gift preceded the time when an enforceable right to the liquidation proceeds accrued (i.e., when the corporation's board passed the final resolution of dissolution)" and, instead, focused on the reality and substance of the events. Id. at 277, 280. Noting the taxpayer's continued control of the corporation and the transferees' inability to vitiate the taxpayer's intention to liquidate, the court determined that the affirmative vote of the shareholders to liquidate the corporation was sufficient to sever the gain from the stock such that the transfer to the charities constituted a transfer of liquidation proceeds rather than an interest in a viable corporation. Id. at 278-279. The court would not "eviscerate established principles of anticipatory assignment of income by considering remote, hypothetically possible abandonments in the face of unrebutted evidence that the taxpayer intended to and did, in fact, complete the liquidation of his corporation." Id. at 280.

In <u>Kinsey v. Commissioner</u>, 477 F.2d 1058 (2d Cir. 1973), affg. 58 T.C. 259 (1972), the taxpayer donated to his alma mater a controlling interest in a corporation that previously had adopted a plan of liquidation pursuant to recommendation by its board of directors and approval by its shareholders. The Court of Appeals for the Second Circuit recognized that the Commissioner's case in <u>Hudspeth v. United States</u>, <u>supra</u>, was stronger because the donor in that case retained a majority of the corporation's stock, but, nevertheless, applied the basic principle in <u>Hudspeth v. United States</u>, <u>supra</u>, that the reality and substance of events determine the incidence of taxation and not formalities and remote hypothetical possibilities. <u>Kinsey v. Commissioner</u>, <u>supra</u> at 1063; see also <u>Jones v. United States</u>, 531 F.2d 1343, 1346 (6th Cir. 1976) (rejecting taxpayer's attempt to distinguish <u>Hudspeth v. United States</u>, <u>supra</u>, the court stated, "we view a taxpayer's control over the corporation as only one factor in determining whether a liquidation is practically certain to occur" (fn. ref. omitted)). The court focused on the fact that although the donee received a majority of the corporation's shares, the donee could not have unilaterally stopped the liquidation because it did not have the requisite two-thirds control. <u>Kinsey v. Commissioner</u>, <u>supra</u> at 1063. The court concluded that, considering all of the circumstances, the transfer of stock to the donee was an anticipatory assignment of liquidation proceeds. <u>Id.</u>

In S.C. Johnson & Son, Inc. v. Commissioner, 63 T.C. 778 (1975), the taxpayer contributed to a charitable organization two forward sales contracts that had substantially appreciated in value as a result of the November 1967 devaluation of the British pound. After assignment of the currency contracts by the taxpayer, the charitable organization entered into negotiations with and sold the contracts to an unrelated third party. The Commissioner asserted that the assignment of the contracts was actually an assignment of "fixed" or "earned" income in light of the fact that the taxpayer "could have closed out its forward position in an economic sense after the devaluation and assured eventual realization of gain under one of three methods". Id. at 784, 787. First, this Court noted that the taxpayer had no legal right to the appreciation in the contracts prior to delivery of the British pounds on the maturity date. Id. at 786. The inquiry, however, did not end. We determined that the taxpayer had not taken any steps to close out its forward position under the sales contracts prior to the gift. We also considered as significant the donee's control over the timing of the receipt of the income and the donee's exposure to potential liabilities in the event of a revaluation of the British pound prior to the maturity date. Id. at 787-788; see also Carborundum Co. v. Commissioner, 74 T.C. 730, 742 (1980) (on facts similar to S.C. Johnson & Son, Inc., we distinguished Kinsey v. Commissioner, supra, and Jones v. United States, supra, because the taxpayers

(and, derivatively, the donees) in those cases "had virtually no control over the course of events once the corporation's plan of complete liquidation had been adopted"); Palmer v. Commissioner, 62 T.C. at 695 (noting that shareholder vote approving redemption did not occur prior to gift and that donee possessed sufficient voting power to prevent redemption, we distinguished Hudspeth v. United States, 471 F.2d 275 (8th Cir. 1972), and Kinsey v. Commissioner, supra, and stated, "at the time of the gift, the redemption had not proceeded far enough along for us to conclude that the foundation was powerless to reverse the plans of the petitioner"). We found that there was no fixed right to income in either a legal or an economic sense prior to the gift of the currency contracts, and, therefore, the gift was not an anticipatory assignment of income.

An examination of the cases that discuss the anticipatory assignment of income doctrine reveals settled principles. A transfer of property that is a fixed right to income does not shift the incidence of taxation to the transferee. The reality and substance of a transfer of property govern the proper incidence of taxation and not formalities and remote hypothetical possibilities. In determining the reality and substance of a transfer, the ability, or the lack thereof, of the transferee to alter a prearranged course of disposition with respect to the transferred property provides cogent evidence of whether there existed a fixed right to income at the time of transfer.

Although control over the disposition of the transferred property is significant to the assignment of income analysis, the ultimate question is whether the transferor, considering the reality and substance of all the circumstances, had a fixed right to income in the property at the time of transfer. See Greene v. United States, 13 F.3d 577, 582 (2d Cir. 1994); Allen v. Commissioner, 66 T.C. 340, 347-348 (1976).

2. The Right to Receive $22.50 a Share in Cash

On July 28, 1988, AHC, CDI Holdings, Inc. (CDI), and DC Acquisition entered into the merger agreement. According to the merger agreement, DC Acquisition would be merged into AHC, and AHC would thereupon become a wholly owned subsidiary of CDI as soon as practicable after DC Acquisition had purchased the stock of AHC pursuant to the tender offer. The merger agreement provided that each outstanding share of AHC stock, following the purchase of AHC stock pursuant to the tender offer, would be converted into the right to receive $22.50 a share in cash. On August 3, 1988, DC Acquisition made a tender offer for the stock of AHC at $22.50 a share. By the close of business on August 31, 1988, more than 50 percent of the outstanding shares of AHC stock had been tendered or guaranteed. At that time, despite the various contingencies to be discussed infra, we believe the reality and substance of the merger agreement and the tender offer indicate that the stock of AHC was converted from an

interest in a viable corporation to a fixed right to receive cash.

The tender or guarantee of more than 50 percent of the outstanding shares of AHC stock was the functional equivalent to a vote by the shareholders of AHC approving the merger. The terms of the tender offer provided that DC Acquisition, with the acquisition of a majority of AHC stock, could assure that the requisite number of affirmative votes in favor of the merger would be received even if no other shareholder voted in favor of the merger. Therefore, with the exception of the hypothetical possibility that a sufficient number of tendered or guaranteed shares of AHC stock could be withdrawn, DC Acquisition was positioned to proceed unilaterally with consummation of the merger by the close of business on August 31, 1988.

Shareholders who tendered their shares maintained withdrawal rights prior to the expiration date of the tender offer. We believe that the existence of withdrawal rights and the potential ability of AHC shareholders to withdraw shares sufficient to make the number of shares tendered or guaranteed fall below a majority of the outstanding shares is analogous to the ability, in theory, of shareholders to rescind a prior shareholder vote approving a merger agreement or a plan of liquidation. In Hudspeth v. United States, supra, and Kinsey v. Commissioner, 477 F.2d 1058 (2d Cir. 1973), the issue as to whether the plan of liquidation was theoretically irreversible was not a significant factor in the

anticipatory assignment of income analysis. Instead, the ability, or lack thereof, of the transferee to vitiate the intention of the transferor and of other shareholders who voted to liquidate the corporation was crucial to determining whether there existed a fixed right to income at the time of the transfer.

First, the existence of withdrawal rights with respect to petitioners was contrary to their express intention to tender all of their shares of AHC stock that was not exchanged for stock in CDI and, in the case of Roger and Sybil Ferguson, to participate in the affairs of AHC and CDI after consummation of the merger. The Charities' ability to vitiate petitioners' intention to maintain the course of events that would result in the planned merger was not enhanced by the remote and hypothetical possibility that petitioners could exercise their withdrawal rights against their interests. Second, petitioners had not tendered their shares by the close of business on August 31, 1988. Notwithstanding petitioners' direct control, collectively, of over 16.9 percent of AHC stock, the existence of withdrawal rights with respect to petitioners was relevant only after they tendered their shares on September 9, 1988, when over 95 percent of the outstanding shares of AHC stock had been tendered or guaranteed. At that time, petitioners' ability to withdraw their shares would not have changed the fact that more than 50 percent of the outstanding shares of AHC stock had been tendered or

guaranteed.  That is also true for the shares tendered by the Charities.  In sum, the existence of withdrawal rights with respect to both petitioners and the Charities did not enhance the Charities' ability to vitiate the intention of shareholders who had tendered or guaranteed a majority of AHC stock and in effect approved the merger agreement.

The fact that the tender offer was conditioned on DC Acquisition's acquiring and owning at least 85 percent of the AHC stock upon consummation of the tender offer (minimum tender condition) also does not change our conclusion.  The minimum tender condition could be waived by DC Acquisition in its sole discretion and, therefore, would not have prevented DC Acquisition from proceeding unilaterally with consummation of the merger by the close of business on August 31, 1988.  The minimum tender condition had no bearing on the ability of the Charities to affect the course of events initiated on July 28, 1988, with the merger agreement and crystallized on August 31, 1988, with "approval" of the merger agreement by shareholders owning a majority of AHC stock.  Also, the limited significance of the minimum tender condition from the perspective of DC Acquisition and its impact on our determination of whether there existed a fixed right to income at the time of the gifts is addressed in our discussion regarding the material change condition of the tender offer, infra.

Petitioners argue that Hudspeth v. United States, 471 F.2d 275 (8th Cir. 1972), and our decision in Estate of Applestein v. Commissioner, 80 T.C. 331 (1983), stand for the proposition that the right to merger or liquidation proceeds "matures" or "ripens" under the anticipatory assignment of income doctrine upon the occurrence of a shareholder vote approving the transaction. Petitioners assert that, in the present case, the consent of the sole director of DC Acquisition to a resolution stating the terms of the merger, dated October 12, 1988, was tantamount to a vote by the shareholders of AHC for purposes of applying the legal reasoning of Hudspeth and Estate of Applestein, and, therefore, the right to receive merger proceeds did not mature or ripen until that time.

The principle set forth in the cases cited by petitioners is not as formalistic as petitioners assert. Those cases stand for the proposition that the reality and substance of events determine tax consequences. The date of the shareholder votes in Hudspeth v. United States, supra, and Estate of Applestein v. Commissioner, supra, was crucial to determining the reality and substance of events; however, we do not believe that application of the anticipatory assignment of income doctrine is conditioned on the occurrence of a formal shareholder vote. The shareholder vote in both cases was considered sufficient to constitute a severance of the economic gain from the investment in the corporation, Hudspeth v. United States, supra at 279; see Estate

of <u>Applestein v. Commissioner</u>, <u>supra</u> at 343, 345, and not a formalistic prerequisite.

In <u>Estate of Applestein v. Commissioner</u>, <u>supra</u>, the taxpayer transferred to custodial accounts for his children stock in a corporation that had entered into a merger agreement with another corporation.  The merger agreement was approved by the shareholders of both corporations prior to the transfer. Although the transfer occurred prior to the effective date of the merger, this Court held that the "right to the merger proceeds had virtually ripened prior to the transfer and that the transfer of the stock constituted a transfer of the merger proceeds rather than an interest in a viable corporation." <u>Id.</u> at 346 (fn. ref. omitted).  In rejecting the taxpayer's argument that the consummation of the merger was not a certainty, this Court stated:

> In the instant case, at the time of transfer, the merger had been agreed upon by the directors and shareholders of both companies and there were no other necessary steps to be taken before the merger became effective.  Any possibilities that the merger would be abandoned by the companies themselves or stopped by a regulatory agency were "remote and hypothetical."  [<u>Id.</u> at 346-347.]

Petitioners' attempt to impose formalistic obstacles to application of the anticipatory assignment of income doctrine is rejected.  The absurd conclusion to petitioners' assertion that the right to receive merger proceeds matured on October 12, 1988, upon consent of the sole director of DC Acquisition to a

resolution stating the terms of the merger, is that the right to receive merger proceeds matured subsequent to payment of those proceeds by DC Acquisition on September 13, 1988. We believe, instead, that when more than 50 percent of the outstanding shares of AHC stock had been tendered or guaranteed, which in effect was an approval of the merger agreement, and the Charities could not vitiate the intention of the shareholders who had tendered or guaranteed a majority of AHC stock, of petitioners, and of DC Acquisition and CDI, the right to merger proceeds matured. When the Charities received AHC stock on September 9, 1988, payment in exchange for those shares pursuant to the tender offer was imminent; i.e., 4 days from the date of the gifts. Moreover, the Charities did not even need to tender their shares, but would have received $22.50 a share in cash because the merger agreement provided that shares outstanding after the tender offer would be converted into the right to receive $22.50 in cash.

The fact that AHC shareholders may not have had a legal right to the merger proceeds prior to acceptance of the tendered or guaranteed shares by DC Acquisition does not change our conclusion. The Court of Appeals for the Eighth Circuit in Hudspeth v. United States, supra, rejected the taxpayer's contention that the gifts preceded the time when an enforceable right to the liquidation proceeds accrued and focused, instead, on the fact that the donees could not change the future course of events; i.e., the liquidation of the corporation. The inquiry in

S.C. Johnson & Son, Inc. v. Commissioner, 63 T.C. 778 (1975), did not end with a determination that the taxpayer did not have a legal right to the appreciation in the currency contracts prior to delivery of the British pounds on the maturity date. Indeed, this Court, among other things, considered as significant the fact that the taxpayer had not taken any steps to close out its forward position under the sales contracts prior to the gift. That inquiry would have been unnecessary if the issue as to whether a taxpayer has a legally enforceable right to income is dispositive of the anticipatory assignment of income analysis. We, therefore, consider petitioners' argument as only one factor in our inquiry to determine the reality and substance of the events surrounding the merger agreement, the tender offer, and the gifts to the Charities.

Petitioners contend that DC Acquisition was not legally obligated to accept the tendered shares and proceed with the merger until September 12, 1988, when DC Acquisition announced its acceptance of the tendered shares. Petitioners characterize DC Acquisition's right to proceed with the merger as an option in light of the material change condition to the tender offer and the occurrence of the fire that destroyed AHC's product manufacturing plant on August 25, 1988. Petitioners assert that DC Acquisition waived the material change condition for the first time when it announced acceptance of the tendered shares.

The occurrence of the fire to AHC's product manufacturing plant and the fact that DC Acquisition and CDI proceeded with the

merger, notwithstanding, demonstrates the extent to which the right to the merger proceeds was fixed once a majority of the outstanding shares of AHC stock had been tendered or guaranteed. A fire that totally destroyed AHC's product manufacturing plant could not shake the resolve of DC Acquisition and CDI in acquiring the central asset of AHC, Sybil Ferguson and the relationships that she had created. DC Acquisition's offering price represented a premium of approximately 1,084 percent over the tangible book value of AHC shares as of June 30, 1988. The value of AHC was not embodied in the company's tangible assets. The value of AHC, and the asset that DC Acquisition and CDI sought, was primarily in the person of Sybil Ferguson and the relationships that she had created. As long as the understanding was in place between DC Acquisition and CDI and the Fergusons that Sybil Ferguson would maintain continued involvement with AHC, the consummation of the merger was a foregone conclusion once the shareholders of AHC "approved" of the merger. To accept any other conclusion would eviscerate established principles of the anticipatory assignment of income doctrine by ignoring the reality and substance of events and attaching significance to remote and hypothetical possibilities.

III.  Conclusion

The reality and substance of events surrounding the merger agreement, the tender offer, and the gifts to the Charities indicate that the stock of AHC was converted from an interest in a viable corporation to a fixed right to receive cash prior to

the date of the gifts.  Therefore, petitioners are taxable on the gain in the stock transferred to the Charities under the anticipatory assignment of income doctrine.  To reflect the foregoing,

Decisions will be entered

under Rule 155.