**Edwin W. HUDSPETH and Maxine G. Hudspeth, Plaintiffs-Appellees,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 72–1106.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 18, 1972.

Decided Dec. 21, 1972.

Carleton D. Powell, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Charles H. Shaffar, St. Ann, Mo., for plaintiffs-appellees.

Before LARAMORE, United States Court of Claims Senior Judge, and BRIGHT and ROSS, Circuit Judges.

LARAMORE, Senior Judge.

This appeal presents the question of whether the taxpayer was entitled to exclude from his gross income the liquidation dividends on stock which he donated to various tax-exempt organizations before actual payments of proceeds were received but after the shareholders had fully adopted a plan of complete liquidation and the corporation had sold its principal assets.

The taxpayer, Edwin W. Hudspeth,[1] owned 81.5 percent (815 of 1,000 shares outstanding) of Maginn-Martin-Salisbury, Inc. (hereinafter "MMS"), a Missouri corporation which operated a mortgage banking business in St. Louis, Missouri. Taxpayer's two sons owned the balance of the outstanding stock. The Board of Directors consisted of taxpayer, his wife and one of his sons, and the taxpayer was the principal corporate officer, occupying the positions of president and treasurer. Pursuant to resolutions adopted by the directors, and ratified by the stockholders at two special meetings on April 10, 1964, a plan of complete liquidation of MMS was adopted. With a view to conforming with section 337 of the Internal Revenue Code of 1954, the plan provided, *inter alia*, that MMS should "proceed to dissolve voluntarily and wind up its affairs and liquidate * * * as soon as practicable after adoption of this plan, but not later than March 31, 1965." In accordance with this plan, MMS entered into a contract on June 17, 1964, with General Mortgage Company of St. Louis (hereinafter "GM"), whereby MMS agreed to sell its mortgage servicing contracts to GM for the sum of $135,000.

On January 21, 1965, taxpayer donated 67 shares of MMS stock to nine tax-exempt charitable and educational organizations. The taxpayer's basis in these 67 shares was $884. Following these donations, taxpayer owned 74.8 percent of the outstanding MMS stock. Between February 10, 1965 and March 31, 1965 the net assets of MMS, having a value of $328,892.33, were distributed to the shareholders in exchange for their MMS stock. The 67 donated shares were redeemed on February 10, 1965 for $22,110. Pursuant to the requisite Missouri laws, MMS filed Articles of Dissolution and Liquidation with the state of Missouri on March 12 and March 29, 1965, respectively. On April 1, 1965, MMS's Certificate of Dissolution was issued by the Secretary of the State of Missouri.

On their 1965 income tax return, the taxpayer and his wife claimed a charitable deduction of $24,610 of which $22,110 was attributable to the 67 donated shares. The taxpayer did not report the gain resulting from the liquidating distributions on these shares inasmuch as he believed that the donation of the stock prior to the actual receipt of the consequential proceeds insulated him from the incidence of taxation thereon.

Upon examination of taxpayer's return the Commissioner of Internal Revenue did not question the deductions for charitable contributions, but he deter-

---

[1]. The taxpayer's wife, Maxine G. Hudspeth, is a party to this action only by reason of having filed a "joint return" with him for the year in question.

mined that the gain on the 67 donated shares should have been included in the taxpayer's 1965 income tax return, as the transfers constituted anticipatory assignments of the liquidation proceeds. Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930); Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L. Ed. 75 (1940). Taxpayer paid the resulting deficiency and brought a timely suit for refund in the U. S. District Court for the Eastern District of Missouri. The District Court, Honorable H. Kenneth Wangelin presiding, sustained the taxpayer's claim in an opinion reported at 335 F.Supp. 1401 (1971). The Government brings this appeal for review of that judgment.

The District Court, relying in part on Jacobs v. United States, 280 F.Supp. 437 (S.D.Ohio 1966), aff'd per curiam, 390 F.2d 877 (6th Cir. 1968), found the crucial issue to be whether the taxpayer was "absolutely and indefeasibly entitled in the immediate future to the liquidating distributions on the stock donated by him." Hudspeth v. United States, 335 F.Supp. 1401, 1404. The court saw determination of this issue as being dependent on whether the plan of complete liquidation adopted on April 10, 1964, was irrevocable or irreversible under Missouri state law at the time of taxpayer's gifts on January 21, 1965. Based on interpretations of the applicable Missouri statutes, the court concluded that the dissolution proceedings of MMS did not become irreversible until the Articles of Dissolution were filed on March 12, 1965, and thus held that the taxpayer was not taxable on the resulting gain attributable to the 67 donated shares.

In viewing the applicable Missouri statutes we find the lower court's interpretations to be untenable as the dissolution proceedings were, in fact, "started" at the time of the shareholders' approval of the plan of complete liquidation. As a result, the liquidation would have been irreversible as of April 10, 1964, under the laws of Missouri in effect at the time of this dissolution, and on the basis of the test outlined by the District Court we would have to conclude that the taxpayers' gifts were anticipatory assignments of the inherent gains and thus taxable to him.

However, a review of the pertinent Federal law in this area convinces us that we must further reject the lower court's finding that the crucial question in this case is, in effect, a determination of whether it was technically possible under Missouri law for the taxpayer to abandon the impending dissolution between the time of his gift and the time of the actual liquidation distributions. While Jacobs suggests such a test, we cannot concur in its application herein. Instead, we must sustain appellant's contention that the realities and substance of the events must govern our determination, rather than formalities and remote hypothetical possibilities. Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916 (1930); Howard Cook, 5 T. C. 908 (1945).

As noted by the lower court, the taxpayer relies primarily on the case of Winton v. Kelm, 122 F.Supp. 649, 651–652 (D.C.Minn.1954) wherein the court stated:

\* \* \* Where income is the product of property and taxpayer makes a complete and irrevocable transfer of such property, *retaining no direct or collateral control over the receipt of its income*, the incidence of tax shifts to the transferee as to *income subsequently earned or realized* upon such asset. Blair v. Commissioner. [300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465 (1937); emphasis added.]

We find taxpayer's reliance on the foregoing misplaced for it, in fact, serves to emphasize the two crucial points which distinguish his situation from the circumstance which would insulate him from taxation. That is, first, the fact that he still retained substantial direct control over the liquidation proceeds, which were the imminent concomitant of the stock, through his control of the corporation. Secondly, it raises the

issue of whether the liquidation proceeds were "subsequently earned or realized" or whether they had, in fact, been "realized" prior to the transfer.

These two factors are a part of the more basic question presented here: What has the taxpayer given—stock or liquidation proceeds? Judicial attempts to determine what the taxpayer has transferred have centered around the question of whether there has been a realization of the gain prior to the transfer, as the courts have concluded that unless such severance has occurred the gift must, in fact be one of stock, rather than the liquidation proceeds. Howard Cook, *supra*; Apt v. Birmingham, 89 F. Supp. 361, 392–393 (N.D.Iowa 1950). In considering the question of what event is sufficient to constitute severance of the gain from the investment for Federal income tax purposes, the court in Winton v. Kelm, *supra*, 122 F. Supp. at 653, concluded that:

> No doubt realization occurs upon the completion of dissolution. Since the substantial element in such dissolution is the stockholders' vote, the formalities following thereafter in order to complete dissolution may be ignored. [Citing Howard Cook, *supra*; Apt v. Birmingham, *supra*.]

While dissolution was contemplated at the time of the stock gift in *Kelm*, the court held for the taxpayer because the shareholders' vote on the resolution to liquidate had not been completed until after the stock transfer. Thus, *Kelm*, like *Cook* and *Apt*, found the shareholders' affirmative vote to liquidate the corporation to be the requisite legal step necessary to effect a "realization" or severance of the gain from the investment such that a subsequent transfer of the stock would constitute a transfer of the liquidation proceeds rather than an interest in a viable corporation.

However, a new dimension was added to this analysis in W. B. Rushing, 52 T. C. 888 (1969), aff'd 441 F.2d 593 (5th Cir. 1971) wherein the shareholders' vote was not found to be sufficient to constitute a realization. In that case the taxpayers had *sold* 100 percent of the stock in two corporations to trusts which they had set up for their children. The taxpayers had voted to liquidate their respective corporations nearly a year prior to the stock sales, and the corporations had already sold substantially all of their assets so as to fall within the provisions of section 337. The Commissioner had argued that in economic reality the taxpayers had constructively received the corporate assets in liquidating distributions and sold such assets, rather than their stock. However, the Tax Court rejected the Commissioner's position in noting that the liquidation would not have been completed without an "affirmative act" on the part of the trustees in authorizing the liquidation distributions, and "[a]s the *only* shareholders, the trusts could have voted to rescind the resolutions of liquidation." *Id.*, 52 T.C. at 897 [emphasis added.]

Both the Tax Court and the Fifth Circuit in affirming emphasized that the tax consequences of the Commissioner's position would only serve to deny the taxpayers the benefits of the installment method of reporting gain (section 453), and that there would be no effect on the character or total amount of gain eventually recognized. This result may be contrasted to the situation here, in which sustaining the taxpayer's position serves to not merely defer recognition of gain, but excludes such gains entirely.

As we interpret *Rushing*, it is not contra to the precedents set out in *Cook*, *Apt* and *Kelm*, *supra*, but rather delineates an important exception to those cases and brings out the essential factors underlying the basis of difference— "intent" and "control." That is, we read *Rushing* as evincing the proposition that if the donor or vendor transfers a *controlling interest* in a corporation, such that the transferee will have the legal capacity to suspend or rescind the liquidation and thereby have the power to supercede the donor's initial intent to provide the donee only with the otherwise imminent liquidation proceeds, then

the gains are not taxable to the transferor. But, in the case where the taxpayer retains control of the corporation and the transferee will be unable to vitiate the taxpayer's intent to liquidate, the shareholders' vote remains sufficient to constitute the necessary severance of gain.

The shareholders' vote is the critical turning point because it provides the necessary evidence of taxpayer's intent to convert his corporation into its essential elements of investment basis and, if it has been successful, the resulting gains. This initial evidence of the taxpayers' intent to liquidate is reinforced by the corporation's contracting to sell its principal assets and the winding-up of its business functions. In the face of this manifest intent, only evidence to the contrary could rebut the presumption that the taxpayer was, in fact, liquidating his corporation. Yet here the record is barren of any evidence that the taxpayer had any intent other than that of following through on the dissolution. The liquidation had proceeded to such a point where we may infer that it was patently never taxpayer's intention that his donees should exercise any ownership in a viable corporation, but merely that they should participate in the proceeds of the liquidation.

Indeed, the taxpayer surprisingly declared, in explaining why the donees of the 67 shares were the first to receive their liquidation proceeds on February 10, 1965, less than three weeks after the gifts, that "[p]laintiffs were determined that whether or not the dissolution of MMS was consummated the charities would be paid the value of their stock through redemption." This statement not only serves to further demonstrate that the shares transferred were merely empty vessels by which the taxpayer conveyed the liquidation proceeds, but it also evidences the extent of taxpayer's control over the corporation and the dissolution proceedings. Because of his position of control, taxpayer was able to give his donees "stock" and insure that the redemption would proceed unhampered so that the objects of his bounty would receive the liquidation proceeds, rather than a continuing interest in a viable corporation. Thus, because of taxpayer's position of control it was unnecessary for taxpayer to await the actual distribution of the proceeds before making his contribution. Moreover, the taxpayer's continued control over the corporation *after* the stock gifts is the crucial element herein which distinguishes taxpayer's situation from *Rushing*, as the donees here were powerless to vitiate taxpayer's manifest intent to liquidate or provide them with the corporation's assets through redemption.

It is this element of control which makes taxpayer's situation not unlike the principles enunciated in Commissioner v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948). In that case the taxpayer gave his wife licensing contracts which he had entered into with a corporation in which he was president, a director, and an 89 percent stockholder. The contracts provided that either taxpayer or the corporation could cancel the agreements upon short-term written notice. Although the taxpayer had assigned all of his rights, title and interests in the contracts to his wife, the Commissioner maintained that the payments made by the corporation to taxpayer's wife, pursuant to the licensing contracts, constituted income to taxpayer by reason of his ability to regulate and control the payments through his control of the closely held corporation. The Supreme Court, in upholding the Commissioner's determination, viewed the crucial question as being "whether the assignor [taxpayer] retains sufficient power and control over the assigned property or over receipt of the income to make it reasonable to treat him as the recipient of the income for tax purposes." *Id.*, 333 U.S. at 604, 68 S.Ct. at 722. The Court reasoned that by virtue of taxpayer's position as president, controlling stockholder, and director of the corporation, he remained in a position to exercise extensive control over the contracts, so that the assignments "left him

with something more than a memory." *Id.*, 333 U.S. at 608, 68 S.Ct. at 724.

Notwithstanding appellees' untenable assertion that *Sunnen* is limited to intra-family relationships, the principle is applicable here. The taxpayer, like *Sunnen*, controlled both ends of the subject of his gift. He was not just another small shareholder donating his stock in a large corporation, but president and treasurer, a director, and a 74.8 percent controlling stockholder. By the exercise of his power to control the liquidation, he insured that the proceeds which he had diverted from himself were received by the recipients of his bounty, thereby procuring the satisfaction of his desire to the same extent as if he had first received said proceeds and then donated them.

In Kinsey v. Commissioner, 58 T.C. 259 (May 10, 1972),[2] a recent decision dealing with the same issue as presented here, the Tax Court similarly concluded that the taxpayer's donation of 56 percent of his 81 percent interest in a corporation which had voted to liquidate and contracted to sell its principal assets prior to the gift was an anticipatory assignment of the liquidation proceeds. Although the donee had received a majority interest in the corporation, the court distinguished *Rushing* by noting that a two-thirds vote of the shareholders would have been required to rescind the earlier authorization to liquidate and thus the donee could not have suspended the dissolution on its own. The taxpayer in *Kinsey* had argued, like the taxpayer herein, that the date of the gift preceded the time when an enforceable right to the liquidation proceeds accrued (*i.e.*, when the corporation's board passed the final resolution of dissolution), but the court held:

> With so much having transpired not only before the date of Kinsey's gift but also before the date of the final resolution to dissolve in September, we cannot consider the September 15 resolution a necessary and important

accessory to the April authorization to liquidate. This final resolution was truly a mere formality, required by state law to officially bring the liquidation to an end.

Similarly, the corporation's filing of the Articles of Dissolution and Liquidation with the state of Missouri were merely ministerial acts necessary to complete the liquidation under state law. We cannot countenance transfers such as presented herein and eviscerate established principles of anticipatory assignment of income by considering remote, hypothetically possible abandonments in the face of unrebutted evidence that the taxpayer intended to and did, in fact, complete the liquidation of his corporation. Through his continued control of the corporation he had foreclosed the possibility of having his intent vitiated. He had made contributions not of stock, but of the proceeds of the liquidation, and he is properly taxable on the gain arising therefrom. Judgment is hereby reversed.

---

2. *Kinsey* is presently on appeal to the U. S. Court of Appeals for the Second Circuit.