**Michael FERGUSON, Valene Ferguson, Roger N. Ferguson and Sybil Ferguson, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 98–70095.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1999.

Decided April 7, 1999.

**998**

David R. Bosse and Eric M. Casper, Walker Ellsworth, Phoenix, Arizona, for the petitioners-appellants.

Kenneth W. Rosenberg and Teresa T. Milton, United States Department of Justice, Tax Division, Washington, D.C., for the respondent-appellee.

Before: CHOY and TASHIMA, Circuit Judges, and RESTANI, United States Court of International Trade Judge.[*]

CHOY, Circuit Judge:

Petitioners Michael and Valene Ferguson and Roger and Sybil Ferguson ("the Fergusons"), residents of Rexburg, Idaho, appeal the decision of the United States Tax Court, which concluded that the Fergusons could be taxed on the gain in appreciated stock that subsequently was transferred to various charitable organizations. *See Ferguson v. Commissioner,* 108 T.C. 244, 1997 WL 203699 (1997). The primary issue before us is whether the Tax

Court correctly held that by the date that the transfer was completed, the stock already had ripened from an interest in a viable corporation into a fixed right to receive cash via an ongoing tender offer or a pending merger agreement such that despite the transfer of the stock, the gain in the appreciated stock was taxable to the Fergusons under the anticipatory assignment of income doctrine. For the following reasons, we affirm the decision of the Tax Court.

*Factual and Procedural Background*

1. *The Acquisition of AHC by CDI*

On April 1, 1985, American Health Companies, Inc. ("AHC"), a Delaware corporation, acquired Diet Center, Inc. ("DC"), an Idaho corporation, which was wholly owned and managed by petitioners Roger and Sybil Ferguson and their five children, including petitioner Michael Ferguson, who files tax returns jointly with his wife, petitioner Valene Ferguson. Through franchises still operating under the name of DC, AHC marketed weight loss and diet counseling services and a variety of vitamins, minerals, and food products.

The Fergusons continued to be involved in the ownership and management of the business of DC. Of the 6,952,863 shares of AHC outstanding on July 28, 1988, the Fergusons collectively owned 1,309,500 shares (18%), and the Fergusons served as several of the officers and directors of AHC and DC.

In late 1987 and early 1988, Goldman, Sachs & Co. was contacted and eventually was authorized by the board of directors to find a purchaser of AHC and to assist in the negotiations. By July 22, 1988, Goldman, Sachs & Co. had found four prospective purchasers.

On July 28, 1988, AHC entered into a merger agreement with CDI Holding, Inc. ("CDI"), a corporation wholly owned by

[*] The Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation.

Thomas H. Lee Co. and ML–Lee Acquisition Fund, L.P., and with CDI's wholly owned and newly formed subsidiary, DC Acquisition Corp. ("DC Acquisition"). With the Fergusons abstaining from the vote, the board of directors of AHC unanimously approved the merger agreement, determining that $22.50 per share was a fair price and intending to recommend acceptance of the tender offer to the shareholders of AHC via a signed letter, which later was sent to all shareholders of record on August 3, 1988, the day that the tender offer was announced.

The merger agreement provided that: (1) DC Acquisition would purchase the majority of the AHC stock through a tender offer at $22.50 per share; (2) DC Acquisition would merge into AHC, leaving AHC as a wholly owned subsidiary of CDI; and (3) as permitted under Delaware corporate law, concurrently with the merger, each still-outstanding share of AHC stock would be converted into a fixed right to receive $22.50 in cash. As stated in the terms of the tender offer, one of the purposes of the tender offer was to acquire, prior to the merger itself, 90% or more of the outstanding AHC stock. Under the short form merger provisions of Delaware corporate law, such an acquisition would permit the merger to be effectuated without the necessity of a formal vote of either the AHC or DC Acquisition shareholders. The other stated purpose was simply to acquire a majority of the outstanding shares in order to ensure that there would be a sufficient number of favorable votes of AHC shareholders (of which DC Acquisition would be the majority one) such that the merger could go forward, if the need arose, under the long form merger provisions of Delaware corporate law.

Importantly, the tender offer, and hence the merger agreement, was conditioned on the acquisition by DC Acquisition of at least 85% of the outstanding shares of AHC by the expiration date of the tender offer, which originally was set at August 30, 1988. However, this minimum tender condition was waivable at the sole discretion of DC Acquisition. DC Acquisition and CDI also expressly reserved the right to terminate the tender offer or to amend its terms upon the occurrence of any material adverse change that affected AHC.

All parties expected that after the merger, Sybil and Roger Ferguson would continue to be involved extensively with the management and ownership of the business of DC. Sybil Ferguson was expected to become the president of AHC under a three-year employment agreement, which included non-competition covenants. Roger Ferguson was expected to continue his role as a consultant for AHC under a matching agreement. Both were also expected to become members of the executive committee of AHC and directors on the board of CDI. Moreover, the Ferguson family was offered the opportunity to exchange their shares of AHC for new shares of CDI. Yet, no written agreement covering these expectations was entered into by the parties.

On August 3, 1988, the tender offer was started. In a disclosure document signed and dated on August 22, 1988, and subsequently filed with the Securities and Exchange Commission, it was noted that the tender offer price of $22.50 per share represented a multiple of approximately 16 times the earnings per share for the year ending March 31, 1988; a 24.1% premium over the market price of an AHC share on July 22, 1988; and a 1084% premium over the tangible book value of an AHC share on June 20, 1988. The shares were tendered as follows:

| Business Date | Percentage of Outstanding Shares Tendered or Guaranteed |
|---|---|
| 8/15/88 | 0.5 |
| 8/16/88 | 1.5 |
| 8/17/88 | 4.6 |
| 8/18/88 | 10.2 |
| 8/19/88 | 10.4 |
| 8/22/88 | 13.7 |
| 8/24/88 | 22.9 |
| 8/25/88 | 26.2 |
| 8/26/88 | 31.5 |
| 8/29/88 | 39.3 |
| 8/30/88 | 41.6 |

| | |
|---|---|
| 8/31/88 | 52.2 |
| 9/1/88 | 52.6 |
| 9/2/88 | 52.8 |
| 9/6/88 | 53.3 |
| 9/7/88 | 53.3 |
| 9/8/88 | 57.2 |
| 9/9/88 | 95.2 |

Importantly, the expiration date for the tender offer, originally set for August 30, 1988, was extended to September 9, 1988, as a result of a fire that completely destroyed AHC's product manufacturing plant on August 25, 1988.

On the final day of the tender offer, the Fergusons exchanged a significant amount of their AHC stock for CDI common and preferred stock, and they tendered the remainder of their AHC stock pursuant to the tender offer.

On September 12, 1988, DC Acquisition announced its acceptance of all tendered or guaranteed AHC shares. The next day, DC Acquisition purchased all of the shares in accordance with the stated terms of the tender offer.

On October 14, 1988, the merger was effectuated pursuant to the vote of the sole director of DC acquisition, adopting a resolution laying out the terms of the merger. Sybil Ferguson became the president of AHC, Roger Ferguson continued to be a business consultant for AHC, and both became members of the executive committee of AHC and directors on the board of CDI.

2. *The Transfer of the AHC Stock from the Fergusons to the Charities*

While the aforementioned events were occurring, the Fergusons transferred some of their AHC stock to three charitable organizations ("Charities"): the Church of Jesus Christ of the Latter Day Saints ("Church"), the Michael D. Ferguson Charitable Foundation ("MFF"), and the Roger and Sybil Ferguson Charitable Foundation ("RSFF"). The latter two charitable organizations were formed by the Fergusons on August 26, 1988.

To obtain assistance in making their intended donations, the Fergusons contacted Brett Floyd, a Merrill Lynch stockbroker.

On August 15, 1988, with Brett Floyd's assistance, Michael Ferguson executed a donation-in-kind record with respect to his intention to donate 30,000 shares of AHC to the Church. Then, on August 16, 1988, Roger and Sybil Ferguson executed a donation-in-kind record with respect to 31,-111 shares of AHC that they intended to donate to the Church. These Merrill Lynch documents were not signed by all of the Fergusons because they were intended merely to be notification to the Church of the Fergusons' intention to donate their shares rather than any sort of legally binding document.

Of particular significance, the original handwritten date in a printed box entitled "date of donation" in the upper right-hand corner of these documents, had been completely scratched out, and the date "9–9–88" had been written next to the scratched-out date. According to Brett Floyd's testimony before the Tax Court, he had replaced the original date because the "date of donation" date was supposed to be the date when the Charities finally had instructed him to do something with the AHC stock rather than the date when the Fergusons actually had donated the stock to the Charities.

On August 15, 1988, and on August 21, 1988, respectively, Brett Floyd allegedly assisted Michael Ferguson, and then Roger and Sybil Ferguson, with executing signed letters of authorization. These letters were internal control documents of Merrill Lynch that authorized in-house transfers (via journal entries on stockbrokers' computers) of customers' stock held by Merrill Lynch in "street name" (i.e., registered under Merrill Lynch's own name and held by Merrill Lynch acting as custodian for the beneficial owners of the stock). According to Brett Floyd's testimony before the Tax Court, these original letters were destroyed by him after they had been replaced by a final set of letters because he had made handwritten notes on the original letters and because changes had been made to the amount of stock that

the Fergusons would be exchanging with CDI-an amount which did not affect the allocation of the AHC stock that was designated to be transferred to the account of the Charities. At this point, if, as alleged, the letters of authorization actually had been signed and finally executed, then, according to Brett Floyd's testimony, Merrill Lynch would have considered the AHC stock to be the property of the Charities.

On August 16, 1988, and on August 23, 1988, respectively, Brett Floyd assisted Michael Ferguson, and then Roger and Sybil Ferguson, with opening new brokerage accounts and depositing some of their shares of AHC into those accounts. The Fergusons' personally-held shares then had to be registered under Merrill Lynch's street name via a process that usually took up to five business days.

Because there was a legend restricting transfer (as it turned out, restricting sale only) on the Fergusons' AHC shares, Merrill Lynch would not sell or otherwise transfer the Fergusons' AHC shares until its legal department had completed its clearance process and then approved the transfer-a process that, as the Fergusons were informed, usually took more than two weeks. Thus, not until September 8, 1988, did Brett Floyd finally make an in-house journal entry that transferred the stock from the Fergusons' accounts to the accounts of the Church and the Fergusons' respective (and respectively named) charitable organizations.

On September 9, 1988, the Fergusons executed final letters of authorization that permitted the transfers that Brett Floyd had made the day before. Billy G. DuPree, Jr., vice president of legal affairs and secretary of AHC, then forwarded to the Securities and Exchange Commission, a disclosure form dated October 5, 1988, which indicated that a change in the beneficial ownership of the AHC stock had occurred on September 9, 1988. According to the Fergusons' later testimony, this disclosure form allegedly was prepared without any independent investigation by Billy G. DuPree, Jr.

By the close of business on September 9, 1988, the Charities tendered to DC Acquisition all of the AHC stock that they had received from the Fergusons. The Church later issued Michael Ferguson a donation-in-kind receipt indicating that the Church had received a donation of 30,000 shares on September 9, 1988.

### Standards of Review

■ As to conclusions of law, the Tax Court's decision will be reviewed under a de novo standard. *See, e.g., Sacks v. Commissioner,* 69 F.3d 982, 986 (9th Cir.1995).

■ As to findings of fact, the Tax Court's decision will be reviewed under a clearly erroneous standard. *See, e.g., Allen v. Commissioner,* 925 F.2d 348, 351 (9th Cir.1991).

■ The questions (to be addressed below) of whether stock had "ripened" and whether a merger was "practically certain" to go through will be treated as factual determinations and therefore will be reviewed for clear error. *See, e.g., Commissioner v. Duberstein,* 363 U.S. 278, 289–91, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960) (reviewing for clear error the determination of whether a transfer was a gift); *Thompson v. Commissioner,* 631 F.2d 642, 646 (9th Cir.1980) (sham transaction); *Estate of Chism v. Commissioner,* 322 F.2d 956, 960 (9th Cir.1963) (dividend). This more narrow standard of review is appropriate given that these determinations "require the Tax Court to focus on the facts and circumstances of particular transactions" and because, "enmeshed as it is in factual considerations, the conclusion reached by the Tax Court will spring more from its experience 'with the mainsprings of human conduct' rather than the application of any legalistic formula." *Thompson,* 631 F.2d at 646 (quoting *Duberstein,* 363 U.S. at 289–91).

### Discussion and Analysis

The key issue here is whether the Fergusons had completed their contributions

of the appreciated AHC stock before it had ripened from an interest in a viable corporation into a fixed right to receive cash. If the Fergusons had done so, then they cannot be taxed on the gain realized when the stock ripened; if they had not, then they can. Because the evidence in the record and the applicable law support the conclusion that the Fergusons' contributions were not completed until after the appreciated AHC stock had ripened, we affirm the Tax Court's decision.

### 1. Completion of the Contributions Under Treas. Reg. § 1.170A–1(b)

The parties and the Tax Court relied upon Treas. Reg. § 1.170A–1(b) to determine the exact date that the Fergusons' contributions were completed. I.R.C. § 170 deals with tax deductions for the payment of charitable contributions, and Treas. Reg. § 1.170A–1(b) deals with the timing of such contributions as follows:

> Ordinarily, a contribution is made at the time delivery is effected.... If a taxpayer unconditionally delivers or mails a properly endorsed stock certificate to a charitable donee or the donee's agent, the gift is completed on the date of delivery or, if such certificate is received in the ordinary course of the mails, on the date of mailing. If the donor delivers the stock certificate to his bank or broker as the donor's agent, or to the issuing corporation or its agent, for transfer into the name of the donee, the gift is completed on the date the stock is transferred on the books of the corporation.

The most relevant provision here, focused upon by the Tax Court and both parties, is the second sentence of the regulation, which deals with the delivery of stock to either a charitable donee or the donee's agent.

■ The Fergusons make two contentions with respect to this provision. First, they contend that the date of delivery directly to the Charities, was the date that Brett Floyd made the in-house journal entries on Merrill Lynch's computers: September 8, 1988. Second, they contend alternatively (and preferably for them) that Brett Floyd was acting as the Charities' agent, or as trustee of a voluntary trust created for the benefit of the Charities, and that the dates of delivery to the Charities' agent therefore were the dates that the Fergusons purportedly executed the alleged original letters of authorization: August 15, 1988 (transfer from Michael Ferguson to the Church); August 21, 1988 (transfer from Roger and Sybil Ferguson to the Church); and August 26, 1988 (transfer from the Fergusons to their foundations on the earliest date possible-the date of the Charities' formation).

However, the evidence in the record does not support any of the Fergusons' contentions but instead supports a finding that the Fergusons' contributions were not completed until September 9, 1988, the date that they executed their final letters of authorization.

The evidence shows that Brett Floyd was not acting on behalf of the Charities (as their agent, as the trustee of a voluntary trust created for their benefit, or in any other capacity) until the time that the Merrill Lynch clearance process had been completed, the AHC stock had been transferred on the books of Merrill Lynch from the Fergusons' account to the Charities' account, and the Fergusons had authorized the transfer, finally and effectively. Even if Brett Floyd had ceased to be acting under the control of the Fergusons at any time, not until Merrill Lynch's legal department had completed its two-week clearance process, would he even have been capable of acting at the Charities' behest with respect to any disposition of the AHC stock, which still remained in the Fergusons' personal accounts. Moreover, in the memorandum disposition cited by the Fergusons as support for their contentions, the Tax Court there held that, under Montana law, a voluntary trust would not be formed without some sign, some overt act, which demonstrated that, after receiving stock on behalf of a named beneficiary, the recipient bank had accepted its posi-

tion as trustee for the benefit of the named beneficiaries. *See Richardson v. Commissioner*, T.C.M. (P–H) ¶ 84,595 (T.C. Nov. 9, 1984). In that case, the contribution thus was not completed for tax purposes until the recipient bank had tendered the received shares on behalf of the named beneficiaries. *See id.* Likewise, in the present case, although controlled as to the formation of a voluntary trust by Idaho law (which does not address this issue), logic and common sense dictate that the Fergusons' gift could not be completed until Merrill Lynch, through its legal department and Brett Floyd, finally had decided that it was willing to transfer the shares according to the Fergusons' wishes and to tender the shares on behalf of the Charities.

Furthermore, contrary to the Fergusons' assertion, Brett Floyd's testimony as to the existence of the original letters of execution and as to the intended purpose of those letters, if they indeed existed, was not uncontroverted. The total absence of any trace of the original letters and the "substantial documentary evidence" that the Tax Court relied upon in its decision, easily could have supported a finding that Brett Floyd was not a credible supporting witness. This documentary evidence included: (1) the donation-in-kind records completed and dated "9–9–88" by Brett Floyd himself; (2) the donation-in-kind receipts submitted and dated September 9, 1988, by the Church; (3) the sole existence of "final versions" (as opposed to "new copies") of the signed letters of authorization; and (4) the disclosure documents dated September 9, 1988, submitted to the Securities and Exchange Commission and completed by Billy G. DuPree, Jr., AHC's very own vice president of legal affairs and secretary. Thus, the evidence in the record clearly supports the Tax Court's implicit finding that there were no original letters of authorization that were intended to be anything other than rough drafts, mere working copies, which in fact were thrown away once they had been replaced by final versions.

Therefore, in the absence of Brett Floyd's role as anything other than an agent of the Fergusons or Merrill Lynch, there could have been no contribution until the delivery of the AHC stock to the Charities' account had been completed. And in the absence of any earlier letters of authorization that were intended to be final and effective, there was no completed delivery to the Charities, no transfer that was legally binding and irrevocable, until the date that the Fergusons' letters of authorization were finally and effectively executed—September 9, 1988.

2. *The Ripening of the AHC Stock*

Under the anticipatory assignment of income doctrine, once a right to receive income has "ripened" for tax purposes, the taxpayer who earned or otherwise created that right, will be taxed on any gain realized from it, notwithstanding the fact that the taxpayer has transferred the right before actually receiving the income. *See Jones v. United States*, 531 F.2d 1343, 1346 (6th Cir.1976); *Kinsey v. Commissioner*, 477 F.2d 1058, 1063 (2d Cir.1973); *Hudspeth v. United States*, 471 F.2d 275, 280 (8th Cir.1972); *Estate of Applestein v. Commissioner*, 80 T.C. 331, 345, 1983 WL 14793 (1983).

While the Ninth Circuit has not addressed the issue of "ripening" yet, several other courts (both tax and appellate) have considered the issue, as shown by the citations above. In light of the soundness of their reasoning and that of the Tax Court in the present case, we now adopt the doctrine as followed by those courts.

To determine whether a right has "ripened" for tax purposes, a court must consider the realities and substance of events to determine whether the receipt of income was practically certain to occur (i.e., whether the right basically had become a fixed right). *See, e.g., Jones*, 531 F.2d at 1346. While the finding of a mere anticipation or expectation of the receipt of income has been deemed insufficient to conclude that a fixed right to income exist-

ed, *see, e.g., S.C. Johnson & Son, Inc. v. Commissioner,* 63 T.C. 778, 787–88, 1975 WL 3062 (1975), courts also have made it quite clear that the overall determination must not be based on a consideration of mere formalities and remote hypothetical possibilities, *see, e.g., Jones,* 531 F.2d at 1346; *Kinsey,* 477 F.2d at 1063; *Hudspeth,* 471 F.2d at 280; *Estate of Applestein,* 80 T.C. at 345.

■ In the present case, the Tax Court determined that the realities and substance of the ongoing tender offer and the pending merger agreement indicated that the AHC stock already had ripened from an interest in a viable corporation into a fixed right to receive cash, by August 31, 1988—the first date by which over 50% of the AHC share had been tendered. To wit, the Tax Court determined that by August 31, 1988, it was practically certain that the tender offer and the merger would be completed successfully and that all AHC stock, even untendered stock, either already had been converted into cash (via the tender offer) or imminently would be converted into cash (via the merger).

The Fergusons contend that until September 12, 1988, the date when DC Acquisition formally announced its acceptance of over 95% of the outstanding AHC shares, the tender offer and the merger still could have been derailed and their AHC stock thus had not ripened. However, in support of their many contentions, the Fergusons raise only possibilities that the Tax Court correctly considered to be remote and hypothetical and therefore irrelevant.

Before turning to a contention-by-contention analysis, it is worth noting that in defending its selection of August 31, 1988, as the relevant date for the ripening of the AHC stock, the Tax Court considered whether, as of that date, the surrounding circumstances were sufficient to indicate that the tender offer and the merger would proceed, as if both had to be completed as of or on that date. For example, the Tax Court initially noted that, as of August 31, 1988, over 50% of the outstanding AHC shares had been tendered, and

then the Tax Court noted that the receipt of this amount alone was sufficient to ensure that DC Acquisition would accept the tendered stock and thus unilaterally could and would proceed with the merger. However, the Tax Court did not need to go that far. In defending its determination of August 31, 1988, the Tax Court really only needed to ascertain that as of that date, the surrounding circumstances were sufficient to indicate that the tender offer and the merger were practically certain to proceed by the time of their actual deadlines-several days in the future. For example, the Tax Court simply could have noted that over 50% of the outstanding AHC shares had been tendered, with over one week remaining in the tender offer window, and several days before the majority shareholders and major dealmakers had tendered their shares-an act that would be emulated by many minority shareholders waiting on the sidelines. To put it simply, the Tax Court could have relied on the way things were going, not merely how things were.

Turning to the Fergusons' individual contentions, we find them to be unpersuasive. First, the Fergusons correctly point out that in the majority of the anticipatory assignment of income cases, some kind of formal shareholder vote (approving a merger, liquidation, or distribution) already had occurred by the time that the stock was deemed to have ripened. *See, e.g., Estate of Applestein,* 80 T.C. at 315 (noting that there had been formal approval by the shareholders of both corporations that were to be merged). However, the language of these cases does not suggest that such formalities are a prerequisite of finding that a ripening has occurred. *See, e.g., Hudspeth,* 471 F.2d at 279. Indeed, the language of these cases only indicates that such formalities are sufficient, not that they are necessary. *See, e.g., id.* (holding that "the shareholders' vote remains *sufficient* to constitute the necessary severance of gain") (emphasis added).

Second, the Fergusons contend that prior to DC Acquisition's acceptance of the tendered stock on September 12, 1988, either of two occurrences might have blocked the successful completion of the tender offer and the merger: (1) the Fergusons, the Charities, or the other shareholders might have withdrawn their tendered shares or simply not tendered their shares; or (2) DC Acquisition might have decided not to accept the tendered stock because the minimum tender condition had not been met yet and because the material change condition had not been waived yet. However, by August 31, 1988, the surrounding circumstances indicate that it was quite unlikely that any of the relevant parties would back out of the tender offer or the merger, and it also was quite unlikely that the requisite number of shares would not be tendered by the close of the tender offer window. *See, e.g., Peterson v. Commissioner*, 51 T.C.M. (CCH) ¶ 1,300 (T.C. July 1, 1986) (concluding that the mere existence of such contingencies would not preclude finding that a fixed right to receive cash proceeds of a stock sale already existed, even though *not a single publicly held share or warrant had been tendered before the contributions*). As discussed previously, by August 31, 1988, the tender offer already had gained a great deal of momentum. Moreover, all of the relevant parties seemed to be getting what they wanted. The Fergusons were receiving a fair amount of cash, generous stock incentives, and assurances that they would continue to play major active roles in the management of their business. CDI, through DC Acquisition, was receiving a very successful business and assurances from the Fergusons that they would continue to be involved extensively in the management and ownership of their busi-

ness.[1] And the minority shareholders were receiving a fair price for their AHC stock, at a substantial premium over its pre-merger price. Therefore, since the clearly stated intentions and expectations of all of the relevant parties, and the surrounding circumstances as of August 31, 1988, suggest that the receipt of cash (as either tender offer or merger proceeds) was practically certain to occur, the Fergusons' AHC stock had ripened by that date. *See, e.g., Hudspeth*, 471 F.2d at 280. Moreover, contrary to the Fergusons' contentions, the fact that as of August 31, 1988, all of the tenders and waivers had not been completed yet meant nothing given that there was no real need for CDI via DC Acquisition to have rushed out and done so already.

Third, the Fergusons and at least one commentator, *see* Note, *Taxpayers Liable for Gain in Stock Donated to Charity During a Tender Offer: Ferguson v. Commissioner*, 51 Tax Law. 441 (1998), contend that the Tax Court's analysis of the likelihood that as of August 31, 1988, the merger would proceed, was fundamentally flawed because it failed to take into account the bilateral nature of a merger. More specifically, they claim that as of August 31, 1988, even though more than 50% of the AHC shareholders had expressed their tacit approval of the pending merger by tendering their shares, there was still a significant possibility that DC Acquisition's own shareholders might not approve of the merger-a threat until 90% ownership had been obtained by DC Acquisition, thereby eliminating the need for any formal shareholder vote. However, further analysis shows that it is the Fergusons' and the one commentator's analyses that are fundamentally flawed. Both

1. In fact, these assurances of continued involvement from the Fergusons were the principal assets of AHC sought by CDI and DC Acquisition, which were willing to pay a 1084% premium over the tangible book value of the AHC shares, thereby demonstrating that the value of AHC was not embodied in its tangible assets. And with the Fergusons' continued assurances in hand, CDI and DC Ac-

quisition understandably were not deterred by the fire at the AHC product manufacturing plant on August 25, 1988-a finding further supported by the fact that as of August 31, 1988, CDI and DC Acquisition had given no indication that they intended to exercise their right to cancel the merger or to renegotiate its terms.

make it sound as if there was much uncertainty as to how the many shareholders of DC Acquisition would vote. Both seem to have completely forgotten that DC Acquisition's sole shareholder was CDI, and that CDI's board of directors (along with DC Acquisition's single director-another corporate insider) therefore effectively could approve the merger without turning to any outside shareholders. And for the reasons discussed above, it was most unlikely as of August 31, 1988, that CDI's board of directors was not fully committed to approving the merger once the tender offer had been completed. Thus, the Tax Court's analysis was sound.

Fourth, the Fergusons attempt to draw analogies to the tax treatment associated with a taxpayer's selection of different accounting methods or with the death of a taxpayer. However, as the government rightly points out, these contexts do not present the same policy considerations as the present one does. Here, but not there, a real danger exists that taxpayers might seek to shift their income to other taxpayers-the very danger that was addressed by the creation of the anticipatory assignment of income doctrine. *See Lucas v. Earl*, 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731 (1930).

On a final note, the Fergusons raise two policy considerations, but these considerations do not support their contentions. First, the Fergusons rightly point out that there is a distinction between tax evasion (i.e., choosing an impermissible path) and tax avoidance (i.e., choosing the least costly permissible path) and that so long as they are acting in accordance with the existing tax laws, the motives for their actions should not dictate the consequences of their actions. However, simply because the Fergusons have the right to choose the least costly path (from a tax perspective) upon which to walk, they do not have the right to be free from taxation if they decide to walk the line between what is and what is not permissible, and happen to stray across it, as they have here. Second, the Fergusons note that the logic of the Tax Court's decision implies that their AHC stock already might have ripened by some date even earlier than August 31, 1988. In essence, they note that there is no clear line demarcating the first date upon which a taxpayer's appreciated stock has ripened into a fixed right to receive cash pursuant to a pending merger. However, from the perspective of taxpayers, walking the line between tax evasion and tax avoidance seems to be a patently dangerous business. Any tax lawyer worth his fees would not have recommended that a donor make a gift of appreciated stock this close to an ongoing tender offer and a pending merger, especially when they were negotiated and planned by the donor. *See, e.g., Gain on Tendered Stock Taxable Despite Charitable Donation*, 26 Tax'n for Law. 114 (1997). Therefore, we will not go out of our way to make this dangerous business any easier for taxpayers who knowingly assume its risks. Moreover, from the perspective of judging such cases, there is no special reason that we should curtail the application of this doctrine simply because it requires "engaging in an exercise in line drawing, a difficult task which nevertheless is part of the daily grist of judicial life." *Badger Pipe Line Co. v. Commissioner*, 74 T.C.M. (CCH) ¶ 856 (T.C. Oct. 8, 1997) (Tannenwald, J.) (discussing generally the determination of the character of a transferred interest).

## Conclusion

Thus, because the Fergusons' contributions of their AHC stock were not completed until September 9, 1988–at least nine days after the stock had ripened, we affirm the Tax Court's decision holding the Fergusons taxable on the gain in the appreciated stock.

**AFFIRMED.**